

Kiernan Trebach LLP
1233 20th Street, NW
8th Floor
Washington, DC 20036
T: (202) 712-7000
F: (202) 712-7100
KiernanTrebach.com

William H. White Jr.
wwhite@kiernantrebach.com

August 14, 2023

**CONFIDENTIAL COMMUNICATION**

*Via Email Only*
Luma S. Al-Shibib, Esquire
Anderson Kill
1251 Avenue of the Americas
New York, New York 10020
lal-shibib@andersonkill.com

      Re:    *Holzman Horner PLLC v. Aspen Electronics Manufacturing, Inc., et al.*

| | |
|---|---|
| Insured: | Holzman Horner PLLC |
| Insurer: | Berkley Insurance Company |
| Policy No.: | PLP-1730816 |
| Policy Period: | April 16, 2021, to April 16, 2022 |
| Claimant: | Aspen Electronics Manufacturing, Inc. and A. Joseph Valdez |
| Claim No.: | 45106 |
| KT No.: | 1519.0297 |

Dear Luma:

    As you know, Kiernan Trebach LLP represents Berkley Insurance Company ("Berkley"). Berkley afforded certain Lawyers Professional Liability Insurance coverage to Holzman Horner PLLC (the "Firm") under Policy Number PLP-1730816, effective from April 16, 2021, to April 16, 2022 (the "Policy" or the "Berkley Policy").

    We write concerning the above-referenced matter arising from an arbitration matter initially filed by the Firm against its former clients, Aspen Electronics Manufacturing Inc., and A. Joseph Valdez (collectively "Aspen"). This letter follows, and supplements, Berkley's prior May 2, 2022, February 3, 2023, and February 10, 2023 reservation of rights letters.

Luma S. Al-Shibib, Esquire                                         CONFIDENTIAL COMMUNICATION
August 14, 2023
Page 2 of 9

For the reasons explained below, Berkley reserves the right to disclaim coverage for the arbitration, to withdraw from the defense and to seek declaratory relief. Berkley further reserves the right to recover expenses incurred in the defense of claims that are not covered under the Berkley Policy or, alternatively, amounts incurred after Holzman Horner refused to consent to settle as recommended by Berkley.

A.   **Factual Background**

The Firm's arbitration asserted that Aspen failed to remit payment of the Firm's fees for legal services rendered. Aspen responded with a vaguely-worded counterclaim for professional negligence and/or legal malpractice (the "Counterclaim" or "Aspen Counterclaim"). As Berkley understands the current posture, Aspen has indicated that it would settle the dispute for $63,100.00, the amount of the fees charged by the Firm and paid by Aspen. As a condition of settlement, however, Aspen wants the Firm to compromise its claim for the fees that it incurred for the arbitration. The Firm has declined to settle on those terms, even though Berkley has offered to fund the $63,100 settlement.

The arbitration arises from a representation undertaken by the Firm to provide Aspen with certain advice and prepare certain agreements with respect to what was initially contemplated to be an asset sale. After performing several weeks of work, amounting to $63,100 in legal fees, the Firm apparently advised Aspen that the tax consequences of an asset-only transaction would be unfavorable. Rather than incur the likely double tax that the asset transaction would entail, Aspen asked the Firm to restructure the deal as a stock sale. The purchaser rejected the stock sale proposal. As a result, neither the asset sale nor the stock sale took place.

The dispute arose between the Firm and Aspen when, in accordance with the retainer agreement, on or about December 1, 2021, the Firm sent a draft invoice in the amount of $50,600. In response, on or about December 22, 2021, separate counsel for Aspen wrote to the Firm proposing to resolve the fee at $22,500 ($15,000 retainer plus another $7500), in view of what Aspen viewed as the Firm's failure to recognize the taxation issue until it had billed 83.6 hours to Aspen.

The Firm did not respond to this proposal and, instead, on December 23, 2021, initiated the arbitration with a demand of $48,100. That same day, Aspen asserts, the Firm sent a revised invoice for $48,100 in fees. Two weeks later, on January 5, 2022, Aspen asserts that the Firm sent a final invoice to Aspen for $63,100 after returning Aspen's $15,000 retainer. Aspen claims that it immediately mailed a check to the Firm for $63,100, with the hope of resolving the dispute. Aspen asserts that the Firm both received and deposited the check. Following that, on January 7, 2022, the Firm allegedly demanded that Aspen pay the Firm an additional $18,000+ in fees and expenses purportedly incurred in preparing and filing the arbitration. According to Aspen, over $14,000 of this amount consisted of fees representing work by the Firm's own attorneys (*i.e.*, not fees charged by outside counsel).

The arbitration dispute was stayed to permit the parties to attend a mediation. At or following the mediation, Aspen made a demand to settle the attorney negligence claim for a

**KIERNAN TREBACH**

Luma S. Al-Shibib, Esquire                                                          **CONFIDENTIAL COMMUNICATION**
August 14, 2023
Page 3 of 9

payment of $63,100 (corresponding to the amount of its payment to the Firm), provided that the Firm agree to judgment against it on its claim for unpaid fees. This demand was made in writing on or about March 20, 2023. Presumably, Aspen seeks to extinguish the Firm's claim for the fees that it has incurred representing itself in the arbitration. Berkley has indicated its willingness to fund such a settlement, but the Firm has refused consent to that settlement.

In response to a request from the Firm, and after initially declining to have Berkley appoint defense counsel to represent it with respect to the legal negligence claim, Berkley has appointed Justin Flint, Esquire to represent the Firm in with respect to the Counterclaim for legal negligence. Berkley's defense has been undertaken subject to a reservation of Berkley's right to disclaim coverage.

B.     **The Berkley Policy**

Berkley afforded certain Lawyers Professional Liability Insurance coverage to Holzman Horner PLLC (the "Firm") under Policy Number PLP-1730816, effective from April 16, 2021, to April 16, 2022, subject to a per-claim and aggregate limit of liability of $3 million (the "Policy" or the "Berkley Policy"). The Policy is subject to a per-claim deductible of $10,000, which applies to only to "Damages", as that term are defined in the Policy.

The Policy's Insuring agreement includes four components: (A) Lawyers Professional Liability Insurance Coverage, (B) Defense, (C) Settlement, and (D) Exhaustion of Limit. Insuring Agreement part A – Lawyers Professional Liability Insurance (as amended by endorsement) provides:

> The **Insurer** agrees to pay on behalf of the **Insured** all sums in excess of the deductible, up to the Limit of Liability, that the **Insured** shall become legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** that is both first made against the **Insured** and reported in writing to the **Insurer** during the **Policy Period**, or any Extended Reporting Period, if applicable, by reason of an act or omission in the performance of **Legal Services** by the **Insured** or by any person for whom the Insured is legally liable, while acting on behalf of the **Named Insured** and/or **Predecessor Firm** for clients of the **Named Insured** and/or **Predecessor Firm** provided that:
>
> 1. no **Insured** gave notice to a **Prior Insurer** of such **Claim** or a **Related Claim**; and/or
>
> 2. no **Insured** gave notice to a **Prior Insurer** of any such act or omission or **Related Act or Omission**; and/or
>
> 3. prior to the inception date of the first policy if continuously renewed, or the date the **Insured** first became a member or employee of the **Named Insured** and/or **Predecessor Firm**, whichever is later, no Insured had a basis to believe that any such act or omission, or **Related Act or Omission**, might reasonably be expected to be the basis of such **Claim**.

**KIERNAN TREBACH**

4. such act or omission occurred on or after April 16, 2015.

"Claim" is defined as follows:

> **Claim** means a demand for money or services, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the **Insured** arising out of an act or omission, including **Personal Injury**, in the rendering of, or failure to render **Legal Services**.

"Claims Expenses" is defined as "fees charged by attorneys designated by the 'Insurer', or by the 'Insured' with the Insurer's written consent" or "all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a 'Claim' if incurred by the Insurer, or by the 'Insured' with the written consent of the Insurer, including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the Insurer to apply for or furnish any such bond . . . ." In other words, 'Claims Expenses' includes expenses of responding to the claim, provided that the expenses are incurred with the consent of Berkley.

Expenditure of "Claims Expenses" does not reduce the available limit of liability to pay "Damages." "Claim Expenses" is subject to a separate and equal limit of liability as that available for the payment of "Damages."

"Damages" is defined as follows:

> **Damages** means judgments, awards and settlements (including pre-judgment interest), provided all settlements are negotiated with the assistance and approval of the **Insurer**. **Damages** also includes punitive and exemplary damages, and the multiple portions thereof, to the extent that such damages are insurable under the law of the most favorable applicable jurisdiction. **Damages** do not include:
>
> 1. legal fees, costs and expenses paid or incurred or charged by any Insured, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing;
>
> 2. civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 18 U.S.C. §1961, et. seq., Federal Rules of Civil Procedure 11 or 28 U.S.C. §1927 and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;
>
> 3. injunctive or declaratory relief; or
>
> 4. any amount for which an Insured is absolved from payment by reason of any covenant, agreement or court order.

Luma S. Al-Shibib, Esquire							**CONFIDENTIAL COMMUNICATION**
August 14, 2023
Page 5 of 9

The Berkley Policy also affords Berkley with "the right and duty to defend, in the Insured's name and on the 'Insured's' behalf, a 'Claim' seeking 'Damages' covered by this Policy even if any of the allegations of the 'Claim' are groundless, false or fraudulent." This includes the right to appoint counsel, as Berkley has done in this case.

The Insuring Agreement's third part, Part C (Settlement), provides that:

> The **Insurer** shall not settle any **Claim** without the **Named Insured's** consent. If, however, the **Named Insured** shall refuse to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, and shall elect to contest the **Claim**, or continue any legal, administrative, or arbitration proceedings in connection with such **Claim**, then the **Insurer's** liability for the **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Claim Expenses** incurred up to the date of such refusal. Such amounts are subject to the provisions of section II. Limit of Liability and Deductible. In the event that the **Named Insured** refuses to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, the **Insurer's** right and duty to defend such **Claim** shall end upon the date of such refusal.

Finally, Part D of the Insuring Agreement provides that Berkley's obligation under the Policy ends when it has exhausted its limit of liability by payment of either "Damages" or "Claim Expenses" or any combination thereof.

The Policy defines several terms, as discussed above. In addition to those terms above, the Policy defines "Legal Services" as:

> **Legal Services** means:
>
> 1. those services, including pro bono services, performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or other neutral fact finder or as a notary public. Any title agency or insurer, on whose behalf the **Insured** acts as title agent or designated issuing attorney, is not an **Insured** under this Policy unless such title agency is a wholly owned subsidiary of the **Named Insured**;
>
> 2. those services performed by an Insured as an administrator, conservator, receiver, executor, guardian, trustee or in any other fiduciary capacity;
>
> 3. those services performed by an Insured in their capacity as a member of a bar association, ethics, peer review, formal accreditation, licensing, or similar professional board or committee related to the legal profession, or

Luma S. Al-Shibib, Esquire                                CONFIDENTIAL COMMUNICATION
August 14, 2023
Page 6 of 9

> 4. those services performed by an Insured as an author, strictly in the publication or presentation of research papers or similar materials and only if the fees, royalties or other revenue generated from such work are not greater than $10,000.
>
> For the purpose of this definition, services performed by an **Insured** in a lawyer-client relationship on behalf of one or more clients shall be deemed **Legal Services** in the **Insured's** capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

The Berkley Policy includes several potentially pertinent exclusions.

> This Policy does not apply:
>
> **A. Intentional Acts**
> to any **Claim** based on or arising out of any dishonest, illegal, fraudulent, criminal, or malicious act or omission or intentional wrongdoing by an **Insured**; provided, however:
>
> 1. this exclusion shall not apply to **Personal Injury**;
>
> 2. the **Insurer** shall provide the **Insured** with a defense of such **Claim** unless or until the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Insurer's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against any **Insured**;
>
> this exclusion will not apply to any **Insured** who is not found to have personally committed the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by any trial verdict, court ruling, or regulatory ruling;
>
> \*       \*       \*
>
> **D. Contractual Liability**
> to any **Claim** based on, or arising out of, or in any way involving an **Insured's** alleged liability under any oral or written contract or agreement, unless such liability would have attached to any Insured in the absence of such agreement;
>
> \*       \*       \*

    C.    **Explanation of Coverage and Reservation of Rights**

For the reasons explained below, Berkely reserves the right to disclaim coverage, withdraw from the defense of the Aspen arbitration, and/or seek declaratory relief principally because (a) the claims asserted against the Firm by Aspen arise out of and are inextricably intertwined with the fees charged by the Firm for legal work performed for Aspen and therefore they do not present a

**KIERNAN TREBACH**

Luma S. Al-Shibib, Esquire  **CONFIDENTIAL COMMUNICATION**
August 14, 2023
Page 7 of 9

"Claim" for "Damages"; and (b) the settlement proposal from Aspen is acceptable to Berkley and the Firm's refusal to consent to that settlement limits Berkley's liability to the amount of the settlement and relieves Berkley of any further duty to defend. Moreover, Berkley reserves the right to recover amounts expended in the defense of Holzman Horner for uncovered claims or for amounts expended in the defense of potentially covered claims after Holzman Horner declined to consent to settlement.

As noted above, the Policy affords coverage for "all sums in excess of the deductible, up to the Limit of Liability, that the 'Insured' shall become legally obligated to pay as 'Damages' and 'Claim Expenses' because of a 'Claim' that is both first made against the 'Insured' and reported in writing to the 'Insurer' during the 'Policy Period'." The Berkley Policy also affords Berkley with "the right and duty to defend, in the Insured's name and on the 'Insured's' behalf, a 'Claim' seeking 'Damages' covered by this Policy even if any of the allegations of the 'Claim' are groundless, false or fraudulent." This includes the right to appoint counsel, as Berkley has done in this case.

"Claim" is defined as "a demand for money or services, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the 'Insured' arising out of an act or omission, . . . in the rendering of, or failure to render 'Legal Services'." Importantly, "Damages" is defined as here pertinent as "judgments, awards and settlements (including pre-judgment interest), provided all settlements are negotiated with the assistance and approval of the 'Insurer'. . . ." The definition of "Damages" continues: "'Damages' do not include . . . legal fees, costs and expenses paid or incurred or charged by any Insured, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing . . . ." Although the Aspen Counterclaim satisfies the definition of "Claim," inasmuch as it is a "demand for money . . . or the institution of any alternative dispute resolution proceeding", the Aspen Counterclaim fails to satisfy the definition of "Damages." More specifically, the Aspen Counterclaim arises from the fees charged by the Firm. Indeed, the injuries claimed by Aspen correspond to the amount of the fees invoiced by the Firm ($63,100). Even if the amounts claimed by Aspen could somehow be divorced from the fees charged by the Firm, the injuries claimed by Aspen are certainly a consequence of the fees charged. Moreover, the Firm's affirmative claims asserted in the arbitration relate to "legal fees, costs and expenses paid or incurred or charged by any Insured." For this reason, the Berkley Policy does not apply to any part of the arbitration, and Berkley hereby reserves the right to disclaim coverage for the Aspen Counterclaim (and the arbitration in general), withdraw from the defense of the Aspen Counterclaim, and/or to seek declaratory relief.

The Insuring Agreement also addresses settlement of Claims:

> The **Insurer** shall not settle any **Claim** without the **Named Insured's** consent. If, however, the **Named Insured** shall refuse to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, and shall elect to contest the **Claim**, or continue any legal, administrative, or arbitration proceedings in connection with such **Claim**, then the **Insurer's** liability for the **Claim** shall not exceed the amount for which the **Claim** could have

> been settled, including **Claim Expenses** incurred up to the date of such refusal. Such amounts are subject to the provisions of section II. Limit of Liability and Deductible. In the event that the **Named Insured** refuses to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, the **Insurer's** right and duty to defend such **Claim** shall end upon the date of such refusal.

This clause has several components:

1. Berkley may not settle any "Claim" without the Firm's consent;
2. If, however, the Firm refuses to consent to a settlement recommended by Berkley, that refusal has several consequences for coverage:
    a. Berkley's liability for indemnity under the Policy "shall not exceed the amount for which the claim could have been settled;
    b. Berkley's liability for "Claim Expenses" is capped at the amounts incurred as of the date of the Firm's refusal to consent to the settlement; and
    c. Berkley's right and duty to defend ends.

Aspen communicated a demand to settle its Counterclaim on or about March 20, 2023. That emailed demand provided:

> Pursuant to the request of the mediator, my clients make a demand for payment of $63,100 in the form of a confession of judgment on the legal malpractice claim.

The confession of judgment in the demand is presumably intended to extinguish the Firm's claim for the fees it has generated through its own work with respect to the arbitration. Indeed, the Firm's actions in the arbitration do not indicate any willingness to resolve any claims. If the Firm were only concerned about collecting its fees from its engagement by Aspen, it would have dismissed the arbitration petition upon being paid in full by Aspen on or shortly after January 5, 2022.

Berkley has indicated its willingness to fund the settlement of $63,100, despite its reservation of rights and the coverage issues described above. The Firm has refused to consent because it does not wish to compromise its affirmative claim for the fees generated in litigating the arbitration (which, as Berkley understands it, are over 6x the amount of the initial fee dispute). In an effort to resolve this matter without compromising the Firm's affirmative claim, Berkley even indicated its willingness to enter into a claim release with the Firm in consideration of Berkley paying the Firm the $63,100 settlement amount. The Firm declined.

In light of the foregoing, Berkley reserves all rights under the Consent to Settle Clause, including the right to withdraw from the defense. Berkley will not have liability for indemnity of any settlement or other award in excess of $63,100, if there is any coverage for this loss under the Berkley Policy. Moreover, Berkley reserves the right to recover from the Firm all defense "Claim

**KIERNAN TREBACH**

Luma S. Al-Shibib, Esquire                                   **CONFIDENTIAL COMMUNICATION**
August 14, 2023
Page 9 of 9

Expenses" incurred after the date on which Berkley indicated that it would settle the Aspen Counterclaim for the amount demanded by Aspen.

      This letter is not intended to provide an exhaustive discussion of every Policy term, condition, exclusion or endorsement and Admiral refers you to the Policy for a complete discussion of all terms, conditions, exclusions and endorsements.

      If you feel that Berkley has not considered some aspect of this claim, or if you have additional information affecting coverage, please forward that information along with your explanation of its significance to us for review.

Very truly yours,

William H. White Jr.

**KIERNAN TREBACH**